IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHN OAKLEAF,

    Plaintiff,[1]

v.                                                                               No. 15-cv-0220 RB/SMV

FNU FRAWNER
and FNU IBRAHIM,

    Defendants.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendants' Motion for Summary Judgment [Doc. 32], filed February 16, 2016. Plaintiff did not respond, and the time for doing so has passed. The Honorable Robert C. Brack, United States District Judge, referred this matter to me for analysis and a recommended disposition. [Doc. 3]. Having reviewed the pertinent filings and relevant law, and being otherwise fully advised in the premises, I recommend that Defendants' Motion for Summary Judgment [Doc. 32] be granted in part and denied in part. Plaintiff's claim for failure to protect should be dismissed with prejudice, and her claim for deliberate indifference to a serious medical need should survive. Finally, I will refer this case to the pro bono panel with a request that a panel member consider contacting Plaintiff for possible representation.

---

[1] Plaintiff identifies as female and prefers the name Julie Marie Oakleaf. [Doc. 1]. Accordingly, the Court will refer to Plaintiff as "she" or "her."

**Background**

Plaintiff has been incarcerated at Otero County Prison Facility ("OCPF") since July 2013, though she has been incarcerated by the state of New Mexico since at least 2009. [Doc. 29-1] at 2. She explains that she is "psychologically a female [but is] being forced to live as a male while incarcerated at . . . OCPF[.]"

A brief detour is in order to define the relevant terms and concepts. The fifth edition of the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM V") explains:

> *Gender dysphoria* as a general descriptive term refers to an individual's affective/cognitive discontent with the assigned gender but is more specifically defined when used as a diagnostic category. *Transgender* refers to the broad spectrum of individuals who transiently or persistently identify with a gender different from their natal gender. *Transsexual* denotes an individual who seeks, or has undergone, a social transition from male to female or female to male, which in many, but not all, cases also involves a somatic transition by cross-sex hormone treatment[2] and genital surgery (*sex reassignment surgery*).

AMER. PSYCHIATRIC ASSOC., DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 451 (5th ed. 2013). "Gender dysphoria . . . reflects a change in conceptualization of the disorder[, which was previously referred to as] gender identity disorder." *Id.* at 814–15 (explaining the manual's change from gender identity disorder ("GID") in the fourth edition to Gender Dysphoria in the current, fifth edition).

Returning to the complaint in this case, Plaintiff claims that she has "repeatedly told . . . medical and mental health staff that, without the right treatment, [she is] at great risk of suicide

---

[2] "Cross-sex hormone treatment denotes the use of feminizing hormones in an individual assigned male at birth based on traditional biological indicators or the use of masculinizing hormones in an individual assigned female at birth." Amer. Psychiatric Assoc., Diagnostic & Statistical Manual of Mental Disorders 451 (5th ed. 2013).

and self-treatment such as self-castration. Plaintiff alleges that she expressed concerns about her safety (due to her transgendered[3] identity) to intake staff when she arrived at OCPF on July 17, 2013. [Doc. 14] at 3. In addition, "[she has] repeatedly told security staff that, because [she is] transgendered, [she is] more likely to be a victim of sexual assault." *Id.* at 2. She complains that "[de]spite [her] concerns, [she was] placed in general population." *Id.* Then, on January 27, 2015, she says that she was the victim of "a sexual assault." *Id.* She says that during the ensuing investigation, she was placed in the "Restrict Housing Unit," but after the investigation, Captain Ochoa (who is not named as a defendant) returned her to general population, despite her objections, and that Defendant Frawner supported the move. *Id.* She says that she was placed in the same "housing unit" as her alleged assailant but in a different "pod." *Id.*

Plaintiff filed her complaint on March 13, 2015. [Doc. 1]. Judge Brack issued a Memorandum Order and Opinion on July 20, 2015, dismissing her claims for release from confinement and ordering her to file an amended complaint identifying the individuals responsible for the alleged violations. [Doc. 13].

Plaintiff filed her amended complaint on July 30, 2015. [Doc. 14]. Plaintiff alleges that Defendants have "denied all treatment for GID, including . . . (1) hormone therapy; (2) a real-life experience of living as a member of the opposite sex; and (3) sex reassignment surgery." *Id.* at 4. In fact, Plaintiff says that Defendant Ibrahim has failed to even evaluate her for GID. *Id.* Finally, she alleges that Defendant Ibrahim has denied her requests for "female undergarments." *Id.* Defendants answered on December 17, 2015. [Doc. 26]. The Court ordered Defendants to

---

[3] Apparently, the stylistic usage of the terms "transgendered" and "transgender" is still in flux. *See* BRYAN A. GARNER, MODERN AMERICAN USAGE, 820, (Jeff Newman &Tiger Jackson eds., 3d. ed. 2009). Plaintiff utilizes the term "transgendered" throughout her filings. The Court follows her lead.

submit a *Martinez* Report. [Doc. 28]. Defendants filed their Report [Docs. 29, 30, 31] and a Motion for Summary Judgment ("Motion") on February 16, 2016. [Doc. 32]. Plaintiff did not respond to the Motion.

**Analysis**

Plaintiff raises two Eighth Amendment claims in her amended complaint, one based on failure to protect and one based on failure to treat. [Doc. 14] at 2−4. As to the claim for failure to protect, I find that Defendants are entitled to summary judgment. Considering the evidence in the light most favorable to Plaintiff, no reasonable jury could find that she faced—or that Defendant Frawner knew of but disregarded—a substantial risk of harm in January of 2015. As to the claim for failure to treat, however, Defendants are not entitled to summary judgment. There is a genuine issue of material fact as to what treatment Plaintiff has been receiving and whether that treatment satisfies the Constitution.

Preliminarily, Defendants argue that all of Plaintiff's claims fail because she alleged that Defendants were not acting under color of state law, as required for relief under 42 U.S.C. § 1983. [Doc. 32] at 7. Their argument is based solely on the fact that in Plaintiff's amended complaint, after listing Defendants' names, she checked a box indicating that they were not acting under color of state law. [Doc. 14] at 1–2. In reviewing Plaintiff's pro se Complaint, the Court applies the same legal standards applicable to pleadings drafted by counsel but liberally construes the allegations. *See Northington v. Jackson*, 973 F.2d 1518, 1520–21 (10th Cir. 1992). Plaintiff is undisputedly challenging actions taken by Defendants in their employ at OCPF, where Plaintiff is incarcerated. *See* [Doc. 14]. I find that despite the boxes Plaintiff checked, the facts in the Complaint allege that Defendants were acting under color of state law when the

underlying events occurred. Besides, other than pointing to the checked boxes, Defendants show nothing indicating that there is any actual dispute about whether they were acting under color of state law.

## Summary Judgment Standard

Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must support its request by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A).

The movant has the initial burden of establishing that there is an absence of evidence to support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If this burden is met, the non-movant must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1526 n.11 (10th Cir. 1992). Although all facts are construed in favor of the non-movant, he still has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (alteration in original) (internal quotation marks omitted).

A pro se non-movant must "identify specific facts that show the existence of a genuine issue of material fact." *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (internal quotation marks omitted). Conclusory allegations are insufficient to establish an issue

of fact that would defeat the motion.  *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1180 (10th Cir. 2013).

In a suit brought by a pro se prisoner, a court may order the defendants to investigate the plaintiff's claims and submit a report of that investigation, called a *Martinez* Report. *See Hall*, 935 F.2d 1106, 1109 (10th Cir. 1991); *Martinez v. Aaron*, 570 F.2d 317, 319–20 (10th Cir. 1978). A court may use the *Martinez* Report to grant summary judgment upon motion of the defendants. *Hall*, 935 F.2d at 1009–13; *see also Celotex*, 477 U.S. at 326 (courts possess the authority to enter summary judgment sua sponte, so long as the losing party is on notice that she must come forward with all her evidence).

## I. Defendant Frawner's alleged failure to protect

Plaintiff alleges that Defendant Frawner failed to protect her in violation of the Eighth Amendment.[4] [Doc. 14] at 3. She states that she told prison officials that she was transgendered when she arrived at OCPF in July 2013 but was placed in general population "in spite of [her] concerns." *Id*. She further alleges that she was sexually assaulted about 18 months later, in January 2015, and that she was returned to general population after her claim was investigated. Finally, she alleges that she was placed in the same housing unit, but a different "pod," as her assailant. *Id*.

---

[4] Defendants allege that Plaintiff has not exhausted her administrative remedies on her failure-to-protect claim as required by the Prison Litigation Reform Act. [Doc. 32] at 7–8. Defendants state that "[Plaintiff] never filed a grievance seeking a different housing assignment or told prison officials she feared for her safety." *Id.* at 8. Plaintiff did file two informal requests concerning her housing assignment following her assault. [Doc. 30-24] at 6, 7. Defendants did not include a copy of OCPF's grievance procedure in their *Martinez* Report. *See* [Doc. 30] at 1–2 (list of documents submitted by Defendants as part of their *Martinez* Report). On the record as it stands at this time, the Court cannot determine the requirements for exhaustion and, thus, whether or not Plaintiff met such requirements. So, the Court will consider Plaintiff's failure-to-protect claim on its merits.

6

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (alteration omitted). The test for whether a failure to meet this duty violates the Eighth Amendment has two prongs. First, the alleged deprivation must be "sufficiently serious" under an objective standard. *Id*. at 834. In cases involving a failure to prevent harm, this means that the prisoner must show that the conditions of her incarceration present an objective "substantial risk of serious harm." *Id*.; *see also Smith v. Cummings*, 445 F.3d 1254, 1258 (10th Cir. 2006).

Second, the prisoner must show that prison officials had subjective knowledge of the risk of harm. In other words, an official "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. This knowledge may be proved "in the usual ways, including inference from circumstantial evidence, and a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. (internal citation omitted).

Even considered in the light most favorable to Plaintiff, no reasonable jury could rely on the record to find that she faced a substantial risk of harm. Plaintiff voiced concerns about her safety during her intake at OCPF when she told staff members that she was concerned that her transgendered status would put her at risk. [Doc. 14] at 3. That was in July 2013. Plaintiff does not allege that she felt—or more importantly, that she *told* anyone at OCPF that she felt—unsafe in the general population over the next 18 months. A screening in November 2013 determined that she was at low risk for sexual victimization. [Doc. 30-5] at 7. At her "six month reviews" in March 2014, October 2014, March 2015, she reported that she had no enemies. *Id.* at 11, 12,

17. Neither her formal grievances nor her informal requests during this time period contain even a hint that Plaintiff felt threatened, [Docs. 30-23, 30-24], and she did not request a new housing assignment. *Id.*

Plaintiff was placed in segregation while her January 2015 allegation of assault was investigated. [Doc. 30-6] at 1–13. The record indicates that prison officials reviewed her accusations and found them to be unsubstantiated.[5] *Id.* at 17; 24–25. Still, Plaintiff has been allowed to shower alone since August 3, 2015. [Doc. 30-5] at 18. Other than her claim in January 2015, Plaintiff does not allege any assaults, threats, or feelings of insecurity. She does not allege that there have been attacks on other transgendered inmates at OCPF. She does not allege that she displays obvious female characteristics that would make her particularly vulnerable to attack. She does not allege that she is housed with inmates known to be predatory. *Cf. Farmer*, 511 U.S. 825 (vacating grant of summary judgment to prison officials on failure-to-protect claim when transgendered plaintiff with feminine characteristics was attacked after she was transferred to a facility and placed in the general population even though defendants knew the facility had a history of violent inmates and plaintiff would be particularly vulnerable); *Greene v. Bowles*, 361 F.3d 290 (6th Cir. 2004) (reversing district court's grant of summary judgment to defendant on failure-to-protect claim when transgendered plaintiff with feminine characteristics was brutally assaulted when defendant knew that transgendered inmates were at greater risk of attack, plaintiff had already been removed from general population because of that risk, and was housed with an inmate known to be predatory); *Zollicoffer v. Livingston*, 4:14-CV-

---

[5] Defendants' *Martinez* Report does not contain all of the investigative materials. *See* [Doc. 30-6]. It includes reports concluding that Plaintiffs' allegation was unsubstantiated, *id.* at 17, 24–25 (000734, 000752–53), but it does not include the materials on which such conclusion was based, *id.* at 1–45. Accordingly, I make no finding as to whether the allegation was *actually* unsubstantiated, only that prison officials concluded that it was unsubstantiated.

03037, 2016 WL 1165776 (S.D. Tex. Mar. 14, 2016) (unpublished) (denying defendant's motion to dismiss a failure-to-protect claim when transgendered plaintiff alleged that she was repeatedly raped and assaulted at prison and prison officials, who were aware of risks to transgendered inmates, denied her five requests to be transferred to a safer housing area).

Thus, the objective prong is not met because there is no indication that there was a substantial risk to Plaintiff. After all, Defendants have presented their reports concluding that Plaintiff was never assaulted, and other than her amended complaint, which vaguely alleges that she was "a victim of sexual assault," Plaintiff does not dispute their conclusion. More to the point, however, even if her allegations had been borne out, even if she had been sexually assaulted, there is no evidence that prison officials could have known that she was at risk prior to the incident. Her very general warning (that she is transgendered) 18 months prior to the alleged assault is not enough to show that Defendant Frawner was subjectively aware of any risk in January of 2015, especially because the interim risk-assessments showed a low risk to Plaintiff. Considering the facts in the light most favorable to Plaintiff, Defendants are entitled to summary judgment on her claim for failure to protect.

## II. Defendants' alleged deliberate indifference to Plaintiff's serious medical needs

Plaintiff alleges that both Defendants were deliberately indifferent to her serious medical needs.[6] She alleges that Defendant Ibrahim failed to evaluate her for GID and that both Defendants failed to treat her transgender condition. [Doc. 14] at 3–4.

---

[6] While Plaintiff brings her failure-to-treat claims under the Eighth Amendment, to the extent they could be interpreted as violating her right Fourteenth Amendment right to equal protection, the claims would fail. The Tenth Circuit "has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims." *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015). "Unequal treatment that does not involve a fundamental right or suspect classification is justified if it bears a rational relation to legitimate penal interest." *Id.* Plaintiff has not alleged—much less shown—that Defendants' decision not to provide Plaintiff with

"A prison official violates an inmate's clearly established Eighth Amendment rights if he acts with deliberate indifference to an inmate's serious medical needs—if he knows of and disregards an excessive risk to inmate health or safety." *Garrett v. Stratman*, 254 F.3d 946, 949 (10th Cir. 2001) (internal quotation marks omitted).  An Eighth Amendment claim of deliberate indifference to serious medical needs requires the plaintiff to demonstrate "both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  To satisfy the objective component, "[t]he prisoner must first produce evidence that the deprivation at issue was in fact sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (internal quotation marks omitted).  That is, the plaintiff's medical condition must have been diagnosed by a physician as mandating treatment, or be so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002).  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Kikumura v. Osagie*, 461 F.3d 1269, 1291 (10th Cir. 2006) (internal quotation marks omitted).  "A complaint about an inadvertent failure to provide adequate medical care or that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.* (internal quotation marks omitted).

The subjective component requires "evidence of the prison official's culpable state of mind," which may be fulfilled by showing that the official "[knew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the

---

female undergarments or hormone therapy is unrelated to a legitimate penal interest.

inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference." *Id.* (brackets and internal quotation marks omitted). "To prevail on the subjective component, the prisoner must show that the defendant[] knew [that the prisoner] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (internal quotation marks omitted). The pertinent question is whether the prisoner's symptoms were such that the defendant "knew the risk to the prisoner and chose (recklessly) to disregard it[.]" *Mata*, 427 F.3d at 753.

In the context of treatment for transgendered inmates, there are two controlling published cases, *Supre* and *Brown*, and two persuasive unpublished cases, *Qz'etax* and *Druley*. In 1986, the Tenth Circuit was one of the first circuit courts to address whether transgendered inmates were constitutionally entitled to cross-sex hormone treatment. *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986). The court held that after Ms. Supre's repeated attempts at self-mutilation and, ultimately, her self-castration, "some form of therapy was necessary." *Id.* at 962–63. However, the court was clear that the Constitution did not mandate any precise form of therapy. Ms. Supre wanted estrogen treatment, and some physicians agreed with her. *Id.* However, other physicians recommended testosterone replacement. *Id.* at 963. The Department of Corrections ultimately denied estrogen and, instead, offered testosterone. *Id.* The court held that the Department of Corrections had made "an informed judgment as to the appropriate form of treatment and did not deliberately ignore [Ms. Supre's] medical needs." *Id.*

In 1995, the Tenth Circuit again addressed whether a prison facility had unconstitutionally denied medical treatment to an inmate for his transgender condition. *Brown v.*

*Zavaras*, 63 F.3d 967 (10th Cir. 1995).  Mr. Brown, a "transsexual" inmate (who identified himself with masculine pronouns) alleged that the defendants had violated the Eighth Amendment by their "total failure . . . to provide any kind of medical attention to the plaintiff for his transsexual condition."  *Id.* at 969–70.  The court noted that Mr. Brown had not alleged that he had received cross-sex hormone therapy prior to his incarceration.  *Id.* at 970 n.2.  The court remanded the case to the district court "to properly determine whether Mr. Brown [was] being offered medical care consistent with *Supre*."  *Id.* at 970.

In 2006, the Tenth Circuit affirmed the dismissal of an action filed by a transgendered inmate in Colorado who challenged the Department of Corrections policy on treatment for GID.  *Qz'etax v. Ortiz*, 170 F. App'x 551, 552 (10th Cir. 2006).  The policy was not described in the order, but it was noted that the plaintiff had been receiving some form of treatment for her transgender condition while incarcerated.  *Id.* at 553.  The district court had found that GID "is an objectively serious medical condition," but the plaintiff had failed to explain how the prison's policy evidenced deliberate indifference to that condition.  *Id.*  The dismissal of the action was upheld.  *Id.*

In 2015, the Tenth Circuit reviewed a district court's denial of a preliminary injunction where a transgendered inmate alleged the defendant employees of the Oklahoma Department of Corrections had violated the inmate's Eighth Amendment right when they attempted to provide treatment for her transgender condition that Plaintiff disagreed with.  *Druley v. Patton*, 601 F. App'x 632 (10th Cir. 2015).  Prior to her incarceration, Ms. Druley had been diagnosed with GID and had undergone two of three gender reassignment surgeries to change her body from male to female.  *Id.* at 633.  During her incarceration, Ms. Druley claimed that the defendants

had violated the Eighth Amendment by, among other things, stopping and starting her prescribed estrogen hormone medications and by giving her inadequately low doses of hormones. *Id.* The court held that there was no evidence that the defendants had failed to make an informed judgment as to the hormone treatment level appropriate for her, or otherwise deliberately ignored her serious medical needs. *Id.* at 635.

### A. Objective Prong

Under controlling Tenth Circuit precedent, I cannot say that the undisputed facts in this case are inadequate as a matter of law to meet the objective prong. The precise contours of this area of law are still being defined. It is not entirely clear what allegations are necessary to meet the objective prong. One the one hand, it is clear that in cases like *Supre* (where an inmate has castrated herself) or *Druley* (where an inmate has already been on cross-sex hormone treatment and has undergone sex-reassignment surgeries prior to incarceration), even a lay person could see the necessity for medical attention. On the other hand, in *Brown*, the only thing we know about the plaintiff was that he "states that he is transsexual," 63 F.3d at 969, that he did "not allege that he had received hormone treatment . . . prior to his incarceration," *id.* at 970 n.2, and that he alleged that the defendants failed to offer any treatment at all for his transgender condition, *id.* at 969.

This question (i.e., what is required to meet the objective prong) matters in the case at bar because, essentially, we have nothing more than Plaintiff herself urging that she is transgendered and asking for treatment for that condition. Does that alone meet the objective prong? None of the Tenth Circuit cases, nor any of the cases cited by Defendants appears to require anything more than a self-declaration that one is transgendered in order to meet the objective prong.

There appears to be no dispute that Plaintiff has never been diagnosed with GID or Gender Dysphoria, or that Plaintiff has never been prescribed cross-sex hormone treatment or any of the other GID-specific treatments she requests. It appears undisputed that Plaintiff did not identify herself as transgendered to prison officials prior to 2012 (when she was already incarcerated but at a different facility than OCPF). Plaintiff, however, has been fairly consistent in her requests for GID treatment and in her self-identification as transgendered since 2012. Although Plaintiff urges that as a transgendered individual, she is at greater risk for self-mutilation and suicide, the record is undisputed that she herself has never expressed self-harm or suicidal ideation while at OCPF. *See* [Doc. 30-16] at 8−9, 000270–271; [Doc. 30-16] at 18, 000280; [Doc. 30-16] at 24, 000286; [Doc. 30-16] at 33–34, 000295–296; [Doc. 30-17] at 3, 000305; [Doc. 30-17] at 28–29, 000330−000331; [Doc. 30-18] at 37–38, 000379–000380; [Doc. 30-19] at 10–11, 000392−000393; [Doc. 30-19] at 25–26, 000407−000408; [Doc. 30-20] at 15–16, 000437−000438; [Doc. 30-21] at 2, 000464; [Doc. 30-21] at 22, 000484.

Under *Brown* in particular, which controls here, I cannot say that these undisputed facts are inadequate as a matter of law to meet the objective prong.

### B. Subjective Prong

Presuming that under *Brown*, Plaintiff's repeated pleas for GID-specific treatment meet the objective prong (i.e., evidence a serious medical need), I find that there is a genuine issue of material fact as to whether the subjective prong is met (i.e., whether Defendants have been deliberately indifferent to that serious medical need). The facts are reasonably susceptible to a finding that Defendants have refused any and all treatment for Plaintiff's transgender condition.

However, a reasonable jury could also find that the general psychiatric treatment that Plaintiff is undisputedly receiving satisfies the Constitution.

For example, Plaintiff argues that Defendants have "denied all treatment for GID" and have even refused to evaluate her for the disorder. [Doc. 14] at 3–4. Defense counsel argues that "Plaintiff has been, and continues to be, provided psychiatric care for her mental health needs, including her requested GID diagnosis." [Doc. 32] at 12. However, argument of counsel is not evidence and cannot support the granting of summary judgment. *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009). Defendants argue that they are providing general "psychiatric care," but they do not expressly dispute that they have completely refused to treat (or even evaluate) Plaintiff for GID. *See* Pascale Affidavit [Doc. 29 1] at 3, ¶ 23.

There is evidence in the record on which a reasonable jury could rely to find that Defendants have entirely refused any treatment at all (or even an evaluation) for GID. *See* [Doc. 30-16] at 312 (000294) (September 11, 2013 memo from C. Pascale, Health Services Administrator, advising that Plaintiff's "request for a written statement regarding [her] diagnosis [of GID] will not be given while at this facility."); [Doc. 30-17] at 28 (00030) (November 25, 2013 treatment note signed by Patrice A. LaLonde, PMHNP-BC, indicating that Plaintiff "must "go through counseling for several years for [a] diagnosis [of GID]." But Plaintiff "cannot get counseling until [s]he is closer to discharge ([s]he reports [s]he has to be within 3 years of discharge)."). The affidavit from the Health Services Administrator does not indicate that Plaintiff is receiving (or has ever received) any evaluation or treatment for GID or her transgender condition at OCPF. *See* Pascale Affidavit [Doc. 29-1] at 3, ¶ 23 ("Although Plaintiff

15

has not been diagnosed with GID, Plaintiff continues to receive psychiatric care during her incarceration at OCPF.").

On the other hand, there is evidence showing that Defendants have provided Plaintiff with general psychiatric care. A reasonable jury could find that this care satisfies the Constitution. For example, a September 2013 treatment note by Richard Laughter, M.D., explains that Plaintiff's history of stroke makes cross-sex hormone treatment unsafe for her. [Doc. 30-16] at 33 (Plaintiff "had a stroke and estrogen therapy is contraindicated due to the risk outweigh [sic] the benefits."). A medication management note from November 25, 2013, indicates that Nurse Practitioner LaLonde "explained that a diagnosis of [GID] cannot be given without ruling out partial androgen insensitivity disorder or congenital adrenal hyperplasia, which cannot be done while [s]he is incarcerated." [Doc. 30-17] at 28 (00030). A reasonable jury could rely on this evidence, among other things, to find that the subjective prong is *not* met and, thus, that Defendants have not disregarded an excessive risk to Plaintiff's health. The material facts are disputed, and summary judgment is not appropriate on the failure-to-treat claim.

## Conclusion

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED in part and DENIED in part**. Plaintiff's claim for failure to protect should be **DISMISSED with prejudice**, and her claim for deliberate indifference to a serious medical need should survive. I will refer this case to the pro bono panel with a request that a panel member consider contacting Plaintiff for possible representation.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN FOURTEEN DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any written objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.** *See* **D.N.M.LR-Civ. 10.1.  If no objections are filed, no appellate review will be allowed.**

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**