IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOHN OAKLEAF,

    Plaintiff,[1]

v.                                                                                                            No. CIV 15-0220 RB/JHR

RICARDO MARTINEZ, Warden of the Otero
County Prison Facility in his official capacity,
CHRIS PASCALE, Health Services Administrator of the
Otero County Prison Facility in her official capacity,
MANAGEMENT & TRAINING CORPORATION, a
corporation based in Centerville, Utah,
DAVID JABLONSKI, Secretary of the New Mexico
Corrections Department in his official capacity, and
DAVID SELVAGE, Health Services Administrator for the
New Mexico Corrections Department in his official capacity,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction against Defendants Jablonski and Selvage and Request for Expedited Hearing, filed on February 6, 2018. (Doc. 209.) Jurisdiction arises under 28 U.S.C. § 1331. The Court held a hearing on the matter on Tuesday, February 27, 2018.

Plaintiff, a transgender woman serving a 15-year sentence, has sought "clinically appropriate medical treatment" from the New Mexico Corrections Department (NMCD) for gender dysphoria since at least November 2012. (Doc. 209 at 1 (citing Doc. 210 ¶¶ 1, 7).) Plaintiff alleges that the NMCD has "ignored or denied" each request and contends that Defendant's "continued refusal to provide adequate treatment . . . has inflicted enormous harm, continues to worsen her condition, and creates a terrible risk of future serious harm and

---

[1] Plaintiff identifies as female and prefers the name Julie Marie Oakleaf. (Doc. 1.) Accordingly, the Court will refer to Plaintiff as "she" or "her."

1

potentially death." (*Id.* at 2 (citing Doc. 211 ¶ 72).) While NMCD has so far refused to give Plaintiff the diagnosis she seeks, the Court finds Plaintiff has failed to show that NMCD has been deliberately indifferent to a serious medical need. Accordingly, the Court will **deny** Plaintiff's motion.

I.  **Factual and Procedural Background**

   A.  **Gender Dysphoria: the Diagnosis and Treatment**

Gender dysphoria, formerly known as "gender identity disorder" (*see* Doc. 231-A at 3), "is a medical condition characterized by clinically significant distress resulting from the misalignment between a person's gender identity—one's innate sense of belonging to a particular gender—and the sex the person was assigned at birth." (Doc. 209 at 2 (citing Doc. 211 ¶¶ 11–12).) Gender dysphoria is a condition recognized by the American Medical Association, the American Psychological Association, and the American Psychiatric Association (in the *Diagnostic and Statistical Manual of Mental Disorders*, Fifth ed. (2013) ("DSM-V")). (*Id.* (citing Doc. 211 ¶¶ 13–14).)

The World Professional Association for Transgender Health (WPATH), "the leading medical authority on gender dysphoria[,] . . . has developed Standards of Care ('SOC') for the treatment of the condition." (*Id.* at 1, 2 (citing Doc. 211 ¶ 19).) The SOC "are recognized as authoritative by every major medical and mental health association . . . ." (*Id.* (citing Doc. 211 ¶ 19).) The SOC "provide for the following treatments, some or all of which will be required depending on the needs of the individual patient:"

(1) Social transition, or "[c]hanges in gender expression and role" (i.e., "dressing, grooming and otherwise outwardly presenting oneself in a manner consistent with one's gender identity");

(2) Hormone therapy ("medically indicated" for persons "with persistent and well-documented gender dysphoria");

(3) "Surgery to change primary and/or secondary sex characteristics"; and

(4) Psychotherapy.

(*Id.* at 2–3 (citing Doc. 211 ¶¶ 22, 26–27).)

Withholding necessary treatments for gender dysphoria "leads to serious medical problems, including clinically significant psychological distress, dysfunction, debilitating depression, self-harm and suicidality." (*Id.* at 3 (citing Doc. 211 ¶¶ 14–15).) "Transgender prisoners . . . , and transgender women in particular, are at an exceeding high risk for severe consequences[,] . . . often resort[ing] to self-surgery to remove their testicles or even suicide." (*Id.* at 3–4 (citing Doc. 211 ¶ 17).)

The National Commission on Correctional Healthcare "recommends that the medical management of prisoners with gender dysphoria should follow the WPATH" SOC. (*Id.* at 4.) "[T]he SOC are clear that treatment for gender dysphoria in institutional settings can and should follow the same protocols as available in the community." (*Id.* (citing Doc. 211 ¶¶ 32–34).)

**B.      Plaintiff's History of Gender Dysphoria**

Plaintiff, currently incarcerated at the Lea County Correctional Facility (LCCF), was arrested in 2008, and pleaded guilty in 2009, to two counts of Criminal Sexual Contact of a Minor (under the age of 13) in the Second Degree. (*See* Doc. 226-1 at 6–9.) Plaintiff was sentenced to 15 years' imprisonment and is scheduled to be released in 2021. (*See id.* at 26; *see also* Doc. 210 ¶ 1.) As supported by the evidence submitted to the Court, Plaintiff was apparently living as a man at the time of his arrest. (*See* Doc. 226-1 at 6–9.) Plaintiff entered prison with diagnoses of adult antisocial behavior, "rule out" (R/O) schizoaffective disorder, and a self-

report of a learning disorder "not otherwise specified" (NOS), bipolar disorder, and depression. (*Id.* at 16, 19.) Plaintiff was taking several psychotropic medications at the time she was incarcerated, including Risperdal, Zoloft, Paxil, and Abilify. (*Id.* at 19.)

Defendants' mental health providers have regularly changed Plaintiff's diagnoses and prescriptions over the course of her incarceration. (*See*, *e.g.*, *id.* at 24 (diagnoses of psychosis NOS and mixed personality disorder; prescriptions of Zoloft and Risperdal); *id.* at 25 (prescription changed to Celexa); *id.* at 44 (prescription changed to Citalopram, Hydroxyzine); *id.* at 47 (diagnoses changed to psychotic disorder NOS, bipolar disorder NOS); *id.* at 48 (prescriptions changed to Risperdal, Celexa); *id.* at 59 (diagnoses changed to psychotic disorder NOS, polysubstance dependence, personality disorder NOS); *id.* at 85 (diagnosis changed to mood disorder NOS; prescriptions changed to Celexa); *id.* at 91 (prescription changed to Paxil); *id.* at 93 (diagnosis changed to major depressive disorder); *id.* at 95 (discontinue all psychotropic medications at Plaintiff's request because she did not like her medications being crushed); *id.* at 130 (diagnoses changed to major depressive disorder, rule out gender identity disorder); *id.* at 136 (began prescription for Paxil); *id.* at 146 (diagnoses changed to bipolar disorder, by history, mild depression and anxiety, sexual disorder NOS); *id.* at 148, 151, 155 (changed prescription to Risperidone; provider noted that Plaintiff denied requesting Risperidone because of its "feminizing adverse reaction" and also that it is contraindicated due to "a drug/drug interaction that can affect heart rhythm"); *id.* at 167 (diagnoses changed to schizophrenia, simple, and sexual disorder NOS); *id.* at 175 (prescriptions changed to Sertraline (Zoloft), Risperdal); *id.* at 176 (diagnoses changed to schizophrenia paranoid type, bipolar type); *id.* at 179 (diagnosis changed to schizoaffective disorder, bipolar type); *id.* at 185 (prescriptions changed to Sertraline, Vistaril,

Risperdal); *id.* at 194 (diagnoses changed to schizoaffective disorder, bipolar type, gender dysphoria).

Plaintiff first raised her concerns regarding gender dysphoria to LCCF staff on November 13, 2012.[2] (*See id.* at 128–29.) On that date, Plaintiff told one of the facility's mental health providers, S. Massengill-Munro, LPCC ("Ms. Munro"), that she wanted to talk about gender dysphoria,[3] and she did not feel comfortable talking to a male therapist. (*Id.*) Ms. Munro noted that Plaintiff was "focused on gender re-assignment surgery and NMCD 'paying for it.'" (*Id.* at 129.) Plaintiff's regular clinician, Scott Adams, M. Ed., LPCC, noted on January 9, 2013, that he advised Plaintiff to use caution regarding "information which could endanger his[4] safety." (*Id.* at 129.)

Plaintiff has received a variety of responses to her requests for treatment for gender dysphoria. On April 15, 2013, Mr. Adams noted that Plaintiff requested to see a "transgender specialist," and Mr. Adams told her that "none are available." (*Id.* at 129.) In September 2013, Dr. Richard Laughter, M.D., informed Plaintiff she would need "several years" of therapy to get a diagnosis of gender dysphoria, and that "estrogen therapy is contraindicated due to" risks associated with Plaintiff's history of a stroke. (Doc. 30-16 at 33.) Also in September 2013, Chris Pascale, Health Services Administrator, told Plaintiff that she "arrived to OCPF on 07-17-13 as a

---

[2] Plaintiff asserts that she first "recalls having a desire to dress in typically feminine ways" and engage "in stereotypical 'girl' activities" as early as five years old. (Doc. 209 at 4 (citing Doc. 210 ¶ 2).) Plaintiff further asserts that she saw a therapist between 2002 and 2007 "for feelings of depression, anxiety and suicidal ideations stemming from her gender dysphoria." (*Id.* (citing Doc. 210 ¶ 5).) Plaintiff states that she began publicly living as a female in her mid-20's—she went by the name of Julie, dressed as a woman, and used feminine pronouns to identify herself. (*Id.* (citing Doc. 210 ¶ 4).) The Court notes that the record evidence tends to refute Plaintiff's assertions. Not only are there no treatment notes before 2012 to support the assertion that Plaintiff sought treatment for gender dysphoria, but also her booking photo upon her arrest shows that she was wearing a full beard, in contravention of her claim that she was presenting herself publicly as a woman. (*See* Docs. 226-1 at 8, 27; 226-2.) Accordingly, the Court declines to accept Plaintiff's unsupported assertion that she was publicly living as a woman or seeking treatment for gender dysphoria before her 2008 arrest.
[3] Plaintiff and some of her providers use the term gender identity disorder, rather than gender dysphoria. Because the DSM-V recognizes the condition as gender dysphoria, the Court will refer only to that condition, despite the references in the treatment records to gender identity disorder.
[4] Where Plaintiff's medical records refer to Plaintiff as a male, the Court will retain that language.

5

male and during his stay at this facility, will remain as such. Your request for a written statement regarding your diagnosis will not be given while at this facility." (Doc. 212-1.) On June 21, 2014, Tala Ibrahim, LPCC, noted Plaintiff's continued "focus on unrealistic expectations while incarcerated such as wearing [a] bra or requesting a laser hair removal machine." (Doc. 226-1 at 153.) Plaintiff filed a formal request for a bra and "female underwear" on June 21, 2014. (Doc. 212-3.) D. Holmes, LVN, replied that "[t]his facility does not provide female underwear to inmates with male genitalia. Please cease with these requests as you have been answered on more than one occasion . . . ."[5] (*Id.*) In September 2014, Plaintiff asked to be seen by a transgender specialist. (Doc. 10-3 at 3.) The provider responded, "The state of NM will not authorize this referral." (*Id.*) On November 29, 2017, Plaintiff asked for treatment for gender dysphoria. (Doc. 232-2.) Cynthia Lose, Psy. D., responded, "This issue is medical, not mental health. Mental health has no knowledge, training or education on the medical treatment of gender dysphoria." (*Id.*) On December 13, 2017, Plaintiff asked about hormone treatment. (Doc. 226-1 at 193.) Dr. Lose's response, noted on the treatment record, was that she "explained the policy and procedure for hormone replacement within NMCD (had to have come into prison with that status)." (*Id.*)

On December 18, 2014, the "Behavioral Health Treatment team met with [the] Mental Health Bureau Chief, Dr. McDermott," regarding Plaintiff's request for a diagnosis of gender dysphoria. (*Id.* at 161.) Ms. Ibrahim noted that the team reviewed the DSM-V criteria for gender dysphoria "along with [Plaintiff's] evaluations, history, and other relevant documentation in [the] psychological file to determine appropriate level of care." (*Id.*) The "review indicated limited supportive evidence on significant distress on inmate global functioning[,]" and the "team

---

[5] Ms. Jillian Shane stated that she gave Plaintiff a bra, but explained that she could not provide female underwear. (Doc. 227 ¶ 10.) Plaintiff denies that Ms. Shane provided her with a bra. (Doc. 234 ¶ 6.)

determined that [Plaintiff] does not meet criteria for the diagnosis of Gender Dysphoria due to insufficient history supporting diagnosis." (*Id.*) Ms. Ibrahim's notes reflected that Plaintiff would continue to receive counseling, medication management, and clinical support to meet her psychological needs. (*Id.*)

Ms. Jillian Shane, Inspector General and Prison Rape Elimination Act (PREA) Coordinator for the NMCD, states that Plaintiff "undergoes screening twice a year by" certain case managers. (Doc. 227 ¶ 8.) Plaintiff's most recent screening occurred on November 14, 2017. (*Id.*; *see also* Doc. 227-C (listing "Assessment Results" as "No risk for sexually aggressive behavior" (Doc. 227-C at 1, 4); "Low risk of sexual victimization" (Doc. 227-C at 2, 3, 5); "Low risk sexually aggressive behavior" (Doc. 227-C at 6)).) There are no notes on these screening results that discuss whether Plaintiff meets the criteria for a diagnosis of gender dysphoria.

Despite Plaintiff's diagnoses and requests for treatment, her mental health treatment records are largely unremarkable. She consistently reports some anxiety and depression, but her providers observe that she is generally stable and does not have thoughts of harming herself or others. (*See*, *e.g.*, Doc. 226-1 at 146, 148, 151, 153, 175, 179, 186, 191, 194.) The record is sprinkled with several notable exceptions to this trend. The first was in July 2013, when Plaintiff shared with E. Royer, LMSW, that she "has had thoughts of self-harm but . . . is able to stay busy when [these] thoughts come." (*See* Doc. 30-16 at 8.) The second was reported at a February 2014 Clinical Assessment, when Plaintiff told Ms. Ibrahim that she had "thoughts of self-mutilation to genital area; however, he has never attempted or currently has any desire to do [sic] as he 'does not like pain.'" (Doc. 226-1 at 142.) Next, on December 8, 2014, Ms. Ibrahim reported that she met with Plaintiff based on a "report of inmate possibly engaging in self infliction/castration attempt. Inmate denied and states incentive not to remove penis for future surgical goals." (*Id.* at

160.) Finally, in November 2015, Plaintiff was placed in temporary restrictive housing on "suicide watch" because she had verbalized thoughts of self-harm. (*See id.* at 170–72.) Plaintiff has stated that she has "thoughts of harming [herself] by removing [her] testicles nearly every day" and "thoughts of committing suicide nearly every day[,]" but she does not regularly share these thoughts with health care staff because she does not want to be placed in solitary confinement. (Doc. 234 at ¶¶ 15–19.)

Plaintiff filed this lawsuit in 2015 to challenge "Defendants' systemic denial of treatment for her gender dysphoria." (*Id.* (citing *Oakleaf v. Frawner*, No. 15-cv-0220 RB/SMV, 2016 WL 9777162, at *2 (D.N.M. June 2, 2016)).) Plaintiff's Third Amended Complaint includes claims for (1) "Denial of Medically Necessary Care in Violation of the Eighth Amendment," (2) Failure to Enact a Policy or Custom Addressing Treatment of Gender Dysphoria in Violation of the Eighth Amendment" and (3) "Failure to Train and Supervise Regarding Serious Medical Needs in Violation of the Eighth Amendment." (See Doc. 182 ¶¶ 72–98.)

### C. Expert Assessment of Plaintiff's Gender Dysphoria and Psychological Status

Plaintiff presents an affidavit from Dr. Randi Ettner, who "is a world-renowned expert on gender dysphoria and the treatment protocols for this condition." (Doc. 209 at 6 (citing Doc. 211 ¶¶ 2–6, Ex. A).) Dr. Ettner has evaluated Plaintiff twice: once on December 22, 2016, and again on December 21, 2017. (Doc. 211 ¶ 36–37, 51.) Dr. Ettner diagnosed Plaintiff with gender dysphoria. (*Id.*)

Through a variety of psychometric tests that gauged Plaintiff's "levels of anxiety, depression, and indicia of suicide[,]" Dr. Ettner "observed that [Plaintiff's] mental health has significantly deteriorated over the course of the year due to the lack of treatment." (Doc. 209 at 6–7 (citing Doc. 211 ¶ 37–39, 47, 59–64).) "Dr. Ettner diagnosed [Plaintiff] with severe

depression and a full-blown, severe anxiety disorder[,]" found that she has "increased suicidal ideations, feelings of total hopelessness and [a] desire to be dead." (*Id.* at 7 (citing Doc. 211 ¶¶ 61–63).) On one test (the Beck Hopelessness Scale), which is an indicator of risk for suicide, Plaintiff's score yielded "the highest possible response . . . ." (*Id.* (citing Doc. 211 ¶ 63).) Dr. Ettner has "determined that [Plaintiff] is losing her will to live due to the denial of health care for her severe gender dysphoria[,]" and "[t]he continued withholding of treatment consistent with scientific and medical protocols will almost inevitably cause the worsening of symptoms and possible self-harm and death . . . ." (*Id.* (citing Doc. 211 ¶¶ 65–67, 72).)

In Dr. Ettner's opinion, "[a]n appropriate treatment plan . . . consistent with the WPATH SOC consists of ongoing treatment by a clinician qualified to treat gender dysphoria, hormone therapy, access to items and clothing available to female inmates, all of which are medically necessary and none of which are contraindicated." (*Id.* at 7–8 (citing Doc. 211 ¶¶ 69–71).) Dr. Ettner warns that "[c]ounseling alone or the provision of psychotropic medications to a severely gender dysphoric patient like [Plaintiff] is not a substitute for actual treatment." (*Id.* at 8 (citing Doc. 211 ¶¶ 24–25).) Dr. Ettner believes that "Defendants' continued denial of treatment will lead to an irremediable course of psychological decompensation and potential death for" Plaintiff. (*Id.* (citing Doc. 211 ¶ 72).)

Defendants' attorney asserted at the hearing that, although Defendants requested a copy of Dr. Ettner's reports and diagnosis from Plaintiff during discovery and in a motion to compel, Plaintiff had refused to provide the documents until she filed this motion. Thus, while Plaintiff told her mental health providers that Dr. Ettner had diagnosed her with gender dysphoria (a fact that is noted in recent treatment records (*see*, *e.g.*, Doc. 226-1 at 194)), neither her mental health providers nor Defendants have had access to that diagnosis or Dr. Ettner's records until recently.

9

## II. Legal Standards

### A. Preliminary Injunction Standard

"As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quotation and citations omitted). Pursuant to Rule 65, the moving party must establish: "(1) a likelihood of success on the merits; (2) a likelihood that [she] will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in [her] favor; and (4) the preliminary injunction is in the public interest." *Republican Party of N.M. v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)); Fed. R. Civ. P. 65.

"[T]he limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held . . . ." *Schrier*, 427 F.3d at 1258 (quotation marks and citation omitted). Accordingly, the Tenth Circuit has noted three types of preliminary injunctions that are particularly disfavored: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Id.* (quotation omitted). If the preliminary injunction that Plaintiff seeks is one of these three types, the Court must closely scrutinize the motion "to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficiente Uniao Do Vegetal*, 389 F.3d 973, 975 (10th Cir. 2004), *aff'd*, 546 U.S. 418 (2006). Further, "a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms . . . ." *Id.* at 976.

Plaintiff advocates for a mandatory preliminary injunction that would alter the status quo. The "status quo is the last uncontested status between the parties which preceded the controversy

until the outcome of the final hearing." *Schrier*, 427 F.3d at 1260. Here, Plaintiff seeks specific treatment from Defendants, "including, but not limited to, (1) ongoing and follow-up evaluation and treatment by a clinician qualified to treat gender dysphoria; (2) hormone therapy; and (3) treatment to affirm social transition, including grooming and clothing items available to other female prisoners." (Doc. 209 at 21.) As Plaintiff does not currently receive these treatments, an order mandating any part of the requested relief would alter the status quo. The requested injunction is also mandatory, in that it would affirmatively require Defendants "to act in a particular way . . . ." *See Schrier*, 427 F.3d at 1261 (quotation omitted).

### B.   Official Capacity Claims against State Defendants

Plaintiff moves for a preliminary injunction against Defendants Jablonski and Selvage, both of whom she has sued in their official capacities pursuant to 42 U.S.C. §§ 1983 and 1988. (*See* Doc. 182.) Suits against a defendant in an official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). "Suits against state officials in their official capacity therefore should be treated as suits against the State." *Hafer*, 502 U.S. at 25 (citation omitted)). And while "[t]he Eleventh Amendment generally bars suits against a state in federal court commenced by citizens of that state[,]" the *Ex Parte Young* doctrine permits an exception where the plaintiff sues "a state official in federal court [and] seeks only prospective equitable relief for violations of federal law . . . ." *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1285, 1286 (10th Cir. 1999) (quoting *Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior*, 160 F.3d 602, 607–08 (10th Cir.) (internal quotation omitted)). Here, Plaintiff has sued state officials and is seeking injunctive relief, rather than damages. Thus, this action is a proper *Ex Parte Young* claim.

11

**III.    Analysis**

   **A.    Likelihood of Success on the Merits**

To establish an Eighth Amendment violation, Plaintiff must show that Defendants were deliberately indifferent to her serious medical needs. *See Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000); *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). "'Deliberate indifference' involves both an objective and a subjective component. The objective component is met if the deprivation is 'sufficiently serious.'" *Sealock*, 218 F.3d at 1209 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation omitted)). "The subjective component is met if a prison official 'knows of and disregards an excessive risk to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 837).

   **1.    Plaintiff's Gender Dysphoria and Risk of Self-Harm are a "Sufficiently Serious" Medical Need.**

To meet the objective component, Plaintiff must show that her symptoms are sufficiently serious. "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (internal quotations omitted)). Here, where Plaintiff has received a diagnosis of gender dysphoria from Dr. Ettner and there is evidence that Plaintiff is considering self-harm, the Court finds that she has shown a sufficiently serious medical need.

   **2.    Plaintiff has not demonstrated that the Defendants have been deliberately indifferent.**

To meet the subjective component, Plaintiff must show that a prison official "knows of and disregards an excessive risk to inmate health or safety." *Sealock*, 218 F.3d at 1209 (citing *Farmer*, 511 U.S. at 837). Here, Plaintiff argues that although Defendants "have been aware of

Plaintiff's gender dysphoria, her thoughts of self-castration, and her escalating distress at having treatment withheld[,]" they have intentionally withheld treatment due to "a blanket refusal to treat gender dysphoria that is diagnosed for the first time in prison." (Doc. 209 at 11 (citing Doc. 212-1).)

Plaintiff contends that Defendants have not "exercise[d] any informed medical judgment regarding [her] medical need for gender dysphoria treatment . . . ." (*Id.* at 18.) The Court agrees that several of Plaintiff's providers have made statements that support Plaintiff's theory that Defendants have refused to individually assess her for gender dysphoria. The most striking examples include Chris Pascale's declaration that Plaintiff arrived to OCPF "as a male and during his stay at this facility, will remain as such" (Doc. 212-1); an unidentified provider's statement that "The state of NM will not authorize [a] referral" for a transgender specialist (Doc. 10-3 at 3); and Dr. Lose's explanation that "the policy and procedure for hormone replacement within NMCD [is that the inmate] (had to have come into prison with that status)" (Doc. 226-1 at 193).

On the other hand, Defendants have come forward with evidence that a Behavioral Health Treatment Team met to assess Plaintiff for gender dysphoria in December 2014. (*Id.* at 161.) The team reviewed the DSM-V criteria for gender dysphoria, "along with [Plaintiff's] evaluations, history, and other relevant documentation in [the] psychological file to determine appropriate level of care[,]" and ultimately determined that Plaintiff did not meet the criteria for a gender dysphoria diagnosis at that time. (*Id.*)

Plaintiff argues that "Defendants cannot discharge their constitutional obligations by providing some treatment for gender dysphoria and calling it a day." (Doc. 209 at 14.) However, Defendants have not diagnosed Plaintiff with gender dysphoria. The only record available that

shows the Defendants exercised individualized judgment on this issue reflects that they did not find Plaintiff to have met the criteria for a gender dysphoria diagnosis. Moreover, Defendants have continued to provide counseling, medication management, and clinical support to meet Plaintiff's psychological needs since that date. Accordingly, under Tenth Circuit precedent, Defendants have met their burden to make "an informed judgment as to the appropriate form of treatment and did not deliberately ignore plaintiff's medical needs." *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986) (finding that where "there were a variety of options available for the treatment of plaintiff's psychological and physical medical conditions" and the prison chose one of those options, plaintiff could not show that "there was a total failure to give medical attention"); *see also Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) (relying on *Supre* and finding that where plaintiff "presented no evidence that the . . . defendants failed to consider the WPATH's flexible guidelines, failed to make an informed judgment as to the hormone treatment level appropriate for her, or otherwise deliberately ignored her serious medical needs[,]" she "failed to demonstrate a substantial likelihood of success on the merits"); *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) (noting that "a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation") (citations omitted).

Plaintiff counters that Defendants now know she has a gender dysphoria diagnosis, a diagnosis that is unrebutted by the record. (Doc. 230 at 8.) As counsel for Defendants reported at the hearing, however, Plaintiff refused to share Dr. Ettner's reports or diagnosis during discovery or in response to a motion to compel. (*See* Docs. 117 (motion to compel); 173 (order denying motion to compel).) Defendants received a draft report during settlement negotiations, but it wasn't until Plaintiff filed this Motion that Defendants had access to Dr. Ettner's actual report.

14

As Defendants were not obligated to take Plaintiff at her word that she received a diagnosis of gender dysphoria from a qualified provider, they were under no obligation to treat her for the condition.[6] And even if Defendants believed that Dr. Ettner diagnosed Plaintiff with gender dysphoria, Defendants did not have access to Dr. Ettner's rationale and were not required to blindly accept Dr. Ettner's opinion over the opinion of their own medical providers.

With respect to Plaintiff's thoughts of self-harm, she admitted that she has not regularly shared these thoughts with her providers, because she does not want to be placed in solitary confinement. (Doc. 234 ¶ 15.) Defendants argue there can be no deliberate indifference to a known medical need where Plaintiff refuses to share her thoughts of self-harm. The Court agrees.

Because Plaintiff failed to share Dr. Ettner's report results with Defendants earlier, and because Plaintiff has not made her symptoms clear to her providers, Plaintiff cannot demonstrate that Defendants have been deliberately indifferent to her medical needs. Consequently, Plaintiff cannot show at this time that she is likely to succeed on the merits of her claim, and this factor weighs in Defendants' favor. "This is especially true in light of the heightened burden on [Plaintiff] to demonstrate [her] entitlement to a preliminary injunction that upends the status quo." *O Centro Espirita Beneficiente Uniao Do Vegetal*, 389 F.3d at 991 (10th Cir. 2004).

### B. Irreparable Harm

Because Plaintiff had not given Defendants Dr. Ettner's reports until recently, Plaintiff cannot demonstrate that, without an injunction, Defendants will violate her constitutional rights. However, the Court agrees that the self-harm Plaintiff contemplates is irreparable. This factor tips in Plaintiff's favor because of the serious risk of self-injury she has reported.

---

[6] Now that they have this evidence, however, Defendants are obligated to reassess Plaintiff. The Court has entered an order to this effect. (*See* Doc. 238.)

### C. Balance of Harms

Plaintiff must demonstrate that "the threatened injury . . . outweighs whatever damage the proposed injunction may cause the opposing party . . . ." *Schrier*, 427 F.3d at 1258 (quotations omitted). Plaintiff argues that the risk of harm (suicide or self-castration) to her is more serious than any risk of harm to Defendants (potentially the expenditure of money to treat Plaintiff, or the time and energy to institute new policy re: transgender prisoners). (Doc. 209 at 20.) Plaintiff cites *Edmisten v. Weholtz*, 287 F. App'x 728, 734 (10th Cir. 2008), for the proposition that "[i]rreparable harm to an inmate caused by a denial of medically necessary care outweighs the potential financial burden on a prison for providing that care." (*Id.*)

Again, however, Plaintiff has failed to establish a likelihood of success on the merits of her Eighth Amendment claim, because there is insufficient evidence to show that Defendants have been deliberately indifferent. The *Edmisten* Court found that imposing a financial burden "would not be misplaced or undue *if in fact one or more of the defendants is legally obligated to provide the treatment.*" *Edmisten*, 287 F. App'x at 734 (emphasis added). Here, Plaintiff has not demonstrated that Defendants—until the point in time when she shared Dr. Ettner's report—have been "legally obligated to provide [any] treatment" for gender dysphoria, because her medical providers ruled out that diagnosis in 2014. *See id.* Indeed, Defendants have been consistently treating Plaintiff for the diagnoses their medical and mental health providers have assessed.

The prison's financial burden is not the only interest at stake. There is also a practical burden at play: "the Court's interference with Defendants' day-to-day decisions regarding how to manage this Plaintiff, particularly to the extent that Plaintiff's requested relief would deviate from how Defendants manage all other inmates, would significantly undermine their discretion and autonomy." *Campbell v. Milyard*, No. 09-CV-01041-CMA-KLM, 2010 WL 5110095, at *8

(D. Colo. Oct. 15, 2010), R&R adopted, No. 09-CV-01041-CMA-KLM, 2010 WL 5102993 (D. Colo. Dec. 8, 2010), *aff'd sub nom.*, *Campbell v. Singh*, 496 F. App'x 774 (10th Cir. 2012) (citing *Taylor v. Freeman*, 34 F.3d 266, 269–70 (4th Cir. 1994)). Plaintiff has not demonstrated that the balance of harms weighs in her favor.

### D. Public Interest

Plaintiff also fails to show that a preliminary injunction is in the public interest. Plaintiff argues that "it is always in the public interest to prevent the violation of a party's constitutional rights." (*Id.* at 20–21 (quoting *Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) (internal quotations and subsequent citations omitted)).) As the Court has explained, Plaintiff has failed to show a constitutional violation.

"The type of injunction Plaintiff seeks—a mandatory injunction—'affirmatively require[s] the nonmovant to act in a particular way, and . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure that the nonmovant is abiding by the injunction.'" *Lemmons v. Houston*, No. CIV-13-494-D, 2013 WL 3974170, at *4 (W.D. Okla. July 31, 2013) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir. 1991), *overruled on other grounds*, *O Centro Espirita Beneficiente Uniao Do Vegetal*, 389 F.3d at 975) (internal citation omitted)). "The Supreme Court has clearly cautioned against judicial interference with the daily administration of prisons." *Id.* (citing *Turner v. Safley*, 482 U.S. 78, 84–85 (1987)).

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

*Id.* (quoting *Turner*, 482 U.S. at 84–85). Granting the requested injunction and ordering the NMCD Defendants to direct their medical and/or mental health providers to take a specific course of treatment, even where that treatment would run counter to the treatment prescribed after the providers have exercised individualized judgment, weighs against the public interest and against the issuance of a preliminary injunction.

## IV. Conclusion

While Plaintiff has shown that she may suffer irreparable harm in the form of self-injury without a preliminary injunction, she has not demonstrated that she is likely to succeed on the merits of her claim. Additionally, the balance of harm and public interest factors weigh in favor of Defendants. For these reasons, the Court will deny Plaintiff's Motion.

**THEREFORE,**

**IT IS ORDERED** that Plaintiff's Motion for Preliminary Injunction against Defendants Jablonski and Selvage and Request for Expedited Hearing (Doc. 209) is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**